COURT OF APPEALS OF VIRGINIA


Present: Judges Willis, Frank and Clements


THERESA JONES

MEMORANDUM OPINION[*]

v.    Record No. 2110-00-2    PER CURIAM
FEBRUARY 13, 2001

RICHMOND DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Judge

(Robert D. Shrader, Jr.; Steingold and
Shrader, on brief), for appellant.

(Alexandra Silva, Assistant City Attorney;
Karen Matthews, guardian ad litem for the
minor child, on brief), for appellee.


Theresa Jones appeals the decision of the circuit court

terminating her parental rights to her daughter. She contends the

evidence was insufficient to show that she "was without good

cause, unwilling or unable to substantially remedy the conditions

leading to the removal." Upon reviewing the record and briefs of

the parties, we conclude that this appeal is without merit.

Accordingly, we summarily affirm the decision of the trial court.

Rule 5A:27.

---

* Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

BACKGROUND

On June 2, 1998, Richmond Department of Social Services (DSS) obtained temporary custody of Jones' then twenty-two-month-old daughter, Crystal, while Jones began serving a six-month jail sentence.[1]  According to Kelly Davis, a DSS social worker, none of appellant's relatives were "interested in getting custody" of the child at that time.  Moreover, the man with whom Jones lived at the time refused to assume custody of the child.

Davis testified that she spoke with Jones in June of 1998 and told her that she was to get into a substance abuse program upon her release from jail.  Davis also told Jones that she "would help her as far as finding housing and employment as well."

On June 16, 1998, the juvenile and domestic relations district court (juvenile court) entered a preliminary protective order directing Jones "[t]o cooperate in the provision of . . . reasonable services or programs designed to protect the child's life, health and normal development."  The order instructed Jones to attend TASC, which is a substance abuse program, to "follow treatment recommendations to completion," to "obtain stable housing and employment," to "enter and complete a parenting class," and to "cooperate w[ith] RDSS."

---

[1] This incarceration was the first of four incarcerations involving Jones during the time period that DSS had custody of the child.

-

In November 1998, one month before Jones' release from jail, DSS placed the child in the custody of Cindy May Jones, Jones' mother and the child's grandmother.[2]  Years earlier, grandmother had obtained custody of another child born to Jones.  That child, who was fourteen years old at the time of the hearing, was eight months old when grandmother acquired custody of him.

Jones was released from jail on December 14, 1998.  She contacted her social worker, Davis, saying she was staying with her mother, Cindy Jones.

Grandmother testified as follows regarding the period after Jones' December 1998 release from jail:

> [W]e had agreed that I was working at night and she was going to keep the—her baby at my house and she was going to get a job working the daytime, but she never wanted to do that.  So I had to get my other daughter to keep Crystal at night, and [Jones] went on her way[;] she wanted to go out at night.

Grandmother noticed that Jones "was doing drugs" after her December 1998 release.  She recalled incidents where Jones would go into the bathroom and return with blood running down her arm.  Grandmother testified that Jones spent little time with the child.  According to grandmother, Jones became violent when she was unable to obtain heroin.  Jones stayed with the grandmother

---

[2] Davis explained that she placed the child with the grandmother "in November of '98 with the possibility when [Jones] got out [in December 1998], [Jones] would soon live with Grandmother and child in the grandmother's home."

-

approximately two weeks before moving out and leaving the child with grandmother.

On December 29, 1998, Jones telephoned Davis and asked for assistance with her substance abuse problem. On January 5, 1999, Davis tried to contact Jones to tell her that she had scheduled an appointment for her at the Richmond Behavioral Health Authority (RBHA) for a drug treatment assessment and evaluation; however, Davis was informed that Jones had been jailed again (the second incarceration). As a result, treatment was again postponed.

After Jones' second release from jail, Davis contacted Jones to inform her that she, Davis, had made another appointment for her at RBHA for a February 3, 1999 assessment and evaluation. Davis accompanied Jones to this assessment. RBHA scheduled Jones to enter a detox program on February 16, 1999. On February 17, 1999, Jones informed Davis she did not attend the detox program because they would not give her enough medication to detox. Jones told Davis that she called Human Resources, Incorporated and that they would help her enter the methadone clinic on March 8, 1999.

Paige Brodie, a substance abuse counselor with Human Resources testified that Jones was on methadone maintenance from 1996 until 1998, but "was discontinued from the Methadone program for noncompliance." On March 8, 1999, Jones entered the relapse prevention program. "She left of her own accord" on March 11, 1999, without explanation. Brodie stated that the programs last twenty-one or twenty-eight days "depending on what they are

-

approved for."  After a participant finishes a twenty-one or twenty-eight day program, counselors determine what individualized aftercare treatment is required.  Because Jones was not in the initial program long enough, Brodie was unable to determine what type of aftercare she would need.

Because Jones was not making progress towards being responsible and because grandmother was already raising one of Jones' children, grandmother relinquished custody of the child in March 1999.  In April 1999, DSS placed the child into foster care with foster mother Cheryl Turner and Turner's husband.  Turner explained that the child exhibited problems with her eyes and speech when she first arrived, but she had made much progress and improvement while in Turner's care.

In late April or early May of 1999, Jones was incarcerated for the third time, this time for violating the terms of her probation.  Specifically, Jones failed to pass a urine screening for illegal drugs.  At the time, Jones was unemployed.

On July 13, 1999, DSS filed a foster care service plan and foster care service plan review with a goal of adoption and a target date of December 1999.

Jones was released from her third incarceration in September 1999.  Shortly thereafter, she began using drugs again.

On November 18, 1999, DSS petitioned the juvenile court to terminate Jones' residual parental rights.  The petition cited Code §§ 16.1-283(C)(1) and (C)(2) as the basis for termination.

-

Jones was incarcerated again in December 1999 until March 13, 2000, at which time the court ordered her to enter the Rubicon Treatment Center. According to Jones, she entered Rubicon's ninety-day substance abuse program and completed it on June 13, 2000. Although Jones indicated she had overcome her addiction, she testified, "I try to attend NA meetings when I get a chance and work and just try to focus on positive things besides using [drugs] even though it crosses my mind every day." Jones said she obtained a job at a motel on June 12, 2000. Jones stated that she does not get along with any of her relatives, thus diminishing the possibility that they will provide any assistance. At the time of the July 2000 hearing, Jones was living with the man who had been her boyfriend for the previous eight years.

At the July 17, 2000 hearing, Jones conceded that Davis tried to get her into a drug treatment program when she was released from jail in December 1998, but, "[a]t that time," Jones "felt like [she] wasn't ready to get into a program." Jones admitted using heroin after her December 1998 release.

Social worker Davis testified that she arranged for Jones to visit Crystal at the DSS office and provided transportation for the child at those visits. Although Jones "was welcomed to have any visitation she wanted" during those periods when she was not incarcerated, Jones often would telephone and cancel scheduled visits. According to Davis, Jones visited the child approximately seven times from February 1999 until July 2000.

-

By order dated August 17, 2000, the trial court found that DSS made reasonable efforts to prevent the child's removal from the home, to return the child to Jones, and to locate suitable relatives for alternative placement. "Despite the efforts of social, mental health, and other rehabilitative agencies to remedy the situation that led to, and required the continuation of, the placement of this child in foster care, Ms. Jones failed, without good cause, to remedy substantially these conditions." Finding that the best interests of the child will be served by termination and "proceeding towards adoption," the trial court terminated Jones' residual parental rights.

ANALYSIS

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

> "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." The trial court's judgment, "when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it."

Id. (citations omitted).

The residual parental rights of a parent may be terminated if a parent

-

without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent . . . without good cause, [has] failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent . . . shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Code § 16.1-283(C)(2).

Jones contends the trial court erred in finding that she failed, without good cause, to remedy substantially the conditions that led to or required continuation of placement of the child in foster care.

The child was placed in foster care on June 2, 1998, and remained in foster care until the July 17, 2000 hearing, a period in excess of two years. On June 16, 1998, the juvenile court issued a protective order directing Jones to obtain and complete treatment, find stable housing, get a job, complete a parenting class and cooperate with DSS upon her release. DSS removed the

-

child from foster care in November 1998 and placed her with the grandmother in hopes of reuniting Jones and her daughter upon Jones' December 1998 release from jail. Jones remained with the grandmother and child for approximately two weeks, after which she chose to leave. She never obtained employment, and, although she had not taken any heroin during her six-month period of incarceration, she resumed taking heroin upon her release. Despite asking for help in obtaining treatment in late December 1998, Jones was incarcerated a second time when the social worker tried to contact her in early January 1999 about a scheduled appointment for treatment.

The social worker made another appointment for Jones to receive treatment on February 16, 1999, following her second release from jail. Jones, however, decided not to enter that program and notified the social worker of that fact a day after failing to attend.

On March 8, 1999, Jones entered another treatment program, but left after three days without explanation and without completing the program.

In March 1999, grandmother returned the child to DSS, which placed her in another foster home. This was the child's third placement by DSS since June 2, 1998.

Jones continued using heroin in February and March of 1999 and, in April or May of 1999, she was incarcerated for the third time. Upon her release in September 1999, Jones did not obtain

-

employment or get substance abuse treatment.  Instead, she began using heroin again.

In December 1999, one month after DSS petitioned to terminate Jones' parental rights, Jones was incarcerated for the fourth time.  At that time, the child had been in the care of DSS for seventeen months.

Although Jones completed a court-ordered ninety-day in-patient program on June 13, 2000, at the time of the July 17, 2000 hearing in the trial court, the child had been under the care of DSS for over two years.  According to Jones, she had only recently obtained a job and completed a substance abuse program.  In light of Jones' past noncompliance in 1998 with the methadone program, her conduct over the two years that DSS had custody of the child, her lack of any support from family or friends, her belated treatment that was forced on her while incarcerated, and her brief period of employment following release, the evidence showed that Jones had not remedied substantially the conditions that led to foster care placement.  Moreover, Jones testified that she thinks about using heroin every day.

The record supports the trial court's finding that DSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(C)(2) and established that termination of Jones' parental rights was in the child's best interests.  Accordingly, we summarily affirm the decision.

Affirmed.

-